Paul Banta, Respondent, v. Union Pacific Railroad Company, a Corporation, Appellant, No. 42208—242 S. W. (2d) 34.

Division One, July 9, 1951.

Motion for Rehearing or to Transfer to Banc Overruled, September 10, 1951.

*Douglas Stripp, W. Coleman Branton* and *Ralph S. Irwin, Jr.,* for appellant; *Watson, Ess, Whittaker, Marshall & Enggas* of counsel.

*Frank Burbridge* and *Clay C. Rogers* for respondent; *Rogers, Field & Gentry* of counsel.

424

CONKLING, J.—Paul Banta, plaintiff-respondent (herein called plaintiff), had a verdict and judgment for $40,000 (which was reduced by remittitur to $25,000) for alleged personal injuries claimed to have been sustained as the result of a fall from an icy ladder on the rear of a locomotive tender at Rock Springs, Wyoming, about 5:35 A. M., on December 18, 1947. He was then working as a locomotive fireman upon an interstate train for his employer Union Pacific Railroad Company, the defendant-appellant (herein called defendant). Plaintiff's petition based his action on a violation of the Boiler Inspection Act, 45 U. S. C. A. § 23 (herein called the "Act.").

The petition alleges that in violation of the Act defendant "did permit a steam line, being a part and appurtenant to the aforesaid locomotive, boiler and tender, to become defective and allow and permit steam to escape, obscure the vision of this plaintiff and to freeze on said ladder, causing it to become icy and slick; that said locomotive, its boiler, tender and all parts and appurtenances thereof, including said ladder, were thus and thereby unsafe to operate in the service it was then and there being put to by the defendant * * * and thereby involve unnecessary peril to plaintiff * * * (and) that as a direct and proximate cause of the aforesaid violations * * * he was caused to become * * * injured", etc.

Plaintiff's run was from Rawlings, Wyoming west to Green River, Wyoming, a distance of 134 miles. He assumed his duties at Rawlings about 2 A. M. on December 18, 1947, on a steam locomotive (Engine No. 7026) which pulled an express and mail train of seven cars and one coach to Green River. The temperature was below freezing. On

its run west from Rawlings the train did not stop until it reached Rock Springs, sixteen miles east of Green River. At the engineer's direction it stopped at Rock Springs for coal and water. At Rock Springs the temperature was then 21°. From Rawlings to Rock Springs, through the mountains, the track was curving, and the last sixty miles were downgrade. The highest altitude reached on the run was ▇ 7014 feet. There was no snow or other precipitation during the trip. The train arrived at Green River, the end of plaintiff's run, about 6:20 A. M. After the train stopped at Rock Springs to take coal and water, plaintiff (as was his duty) alighted from the locomotive on the right (north) side, walked to the rear of the tender and went up the ladder at the right rear corner of the tender to the top thereof. He there attended to filling the tank with water from a water spout at the side of the track. Another employee attended to the automatic loading of the coal. Plaintiff testified that as he was descending he slipped on the icy ladder and fell about four feet to the ground. Plaintiff was the only witness who testified to any facts respecting the condition of the ladder and his alleged fall. The locomotive and tender were standing motionless at the time plaintiff fell. Since that day plaintiff has done no railroad work at all.

Plaintiff testified that when the train was a half mile west of Rawlings, he looked back toward the rear of the train to check his side of the train. He then discovered that steam, coming from a leak in a steam line under the tender near the rear end thereof, was coming out between the tender and the front end of the first coach. That escaping steam prevented him seeing back along the left side of the train. Plaintiff did not report the steam leak to his engineer. The steam was still escaping when the train stopped at Rock Springs and five-sixths of the water in the tanks had then been used up. The steam continued to escape until that particular steam line was turned off when the train was eight miles west of Rock Springs.

The photographic exhibits and the testimony show that there was a steel stirrup below the sill of the tender involved on the right side thereof at the rear; that there was (next above the stirrup) an aperture in the sill itself into which trainmen could place a foot in ascent to the sill or in descent therefrom. The ladder itself was based on the right rear corner of the sill of the tender, was behind the tank and extended upward from the sill. Ascending or descending the ladder a trainman faced forward toward the front of the engine.

Plaintiff also testified, "From the steam leak of this train line underneath here that steam was going back. That steam line was on the left-hand side of that tender and it comes across toward the drawbar, and that is where the leak was, right there in that apparatus somewhere. That steam was boiling up between the first car and this tender * * * it was blowing back (toward) the northwest (right front) corner of the first coach * * * (and) going in all directions

hitting these connections.'' On cross-examination plaintiff testified that there was ice and frost on the ladder, both on the cross-pieces and the side bars and that it was slippery; and that ''the ice on the ladder, or frost * * * came from the steam that was leaking, * * * the front end of the (first) coach was iced up.'' Testimony of other witnesses established that in cold weather nearby escaping steam will freeze on the steps of the ladder on the back end of the tender.

Plaintiff further testified that when he went to the rear of the tender, he went up the stirrup to the sill, and on up the ladder to the platform near the top of the tender. A nearby flood light gave ''plenty of light''. He ''went right on up'' without difficulty and attended to getting water into the tank. When plaintiff was descending the ice covered ladder the escaping steam covered his glasses, ''I couldn't see exactly where I was because I had these glasses on and they blinded me. I was reaching for this ladder, this little ladder here, and I couldn't see it. I was somewhere right along in here (indicating) I don't know exactly where I was, but I was trying to reach this little landing (sill) right here and my foot slipped off the ice on one of these rounds right here, and I fell to the ground, * * * (it was) because of the ice on the ladder (that plaintiff was) caused to slip and fall''.

After his fall plaintiff climbed back into the cab and performed his usual duties on into Green River, the end of his run. At Green River he did not report that he had fallen. He left Green River that night about midnight and ''deadheaded'' back to Rawlings. He then reported to the railroad and ''laid-off'' saying he was going to the doctor. On December 24, 1947, plaintiff's trainmaster held a hearing concerning plaintiff's violation of rules in failing to promptly report a personal injury. At that hearing plaintiff testified he did not report the fall to his engineer; that he did not report the accident at all; that ''there was some steam and the ladder was frosty and slick''; that there were no ''defects on the engine that could have caused this injury''; and that ''my left foot slipped off of the ladder and I started to put my right foot on the other ladder but I missed it''.

The testimony of other employees who were on the train on that run, as well as the testimony of employees who handled, operated and inspected engine 7026 on the night in question (both before and after plaintiff's run) tended to prove that there was no steam leak under the tender of engine 7026. Such differences in the testimony were for the jury's determination and were foreclosed by the verdict.

On January 8, 1948, plaintiff gave a written and signed statement to his employer and therein said: ''When I went up the ladder was frosty, which was due to the natural weather condition—it was not snowing or storming'', etc. ''I think that right where tank sitting or near there was steam coming out of a steam line and a steam heat line

and the wind was just simmering the steam up through there, and while I don't know, I am of the opinion that might have made the ladder somewhat frosty in addition to the regular weather. * * * I did not think anything of this (fall) and consequently said nothing to the engineer. * * * The ladder on end of tank, and the ladder I used at time I fell, and the end of the engine tank, all on 7026, were all in first class condition, and complied with U. S. Safety appliances, standard, they were secure, and solid, and as stated only thing was they were frosty and slick, but it was clean, and clear that is, the ladder was clean, and nothing wrong with it at all, or where I fell.'' Plaintiff wrote thereon that he had read the report and that it was true. Other facts will be hereinafter noted.

Under the circumstances appearing in the record before us, and in view of plaintiff's explanations of what he had said on December 24, 1947 and on January 8, 1948, the weight and credibility of his testimony were clearly for the triers of the facts. From the verdict returned it is apparent that the jury (as they had a right to do) accepted the version of the occurrence given by plaintiff in his oral testimony at the trial.

Defendant now first contends that the trial court erred in refusing to sustain its motion for a directed verdict because (defendant says) it does not appear plaintiff's injury was due to any violation of the Boiler Inspection Act; that "slipperiness due to ice or frost from moisture naturally and unavoidably emitted by a locomotive while en route, or from moisture normally present in the atmosphere, is a necessary peril of steam railroading in winter and not a violation of the Act.'' As to that contention it is axiomatic that we must state the case and consider the instant facts and the reasonable inferences therefrom in the light most favorable to the verdict below, and give plaintiff the benefit of every favorable inference which the evidence tends to support.

Defendant's argument upon this point of its appeal seems based upon testimony of record that all of the water used and all the steam generated in a steam locomotive (except that steam which goes back into the steam line through the cars of the train) is emitted in some form from the locomotive itself; that the emission of such steam and water is normal and necessary in the operation of a steam locomotive; that such steam emitted from the locomotive condensed in the cold winter atmosphere; that the forward movement of the train has "a *tendency* to suck (such condensed moisture) under the train and between the cars and engine'', and thus to form ice on the tender and ladder during the winter months; that, "steam and ice run hand in hand in the winter time.'' From that testimony defendant argues that the iced condition of the ladder was "a necessary peril of steam railroading in winter and not a violation of the (Boiler Inspection) Act.''

428

The Boiler Inspection Act, 45 U. S. C. A. § 23, declares that: "It shall be ▓▓▓ unlawful for any carrier to use or permit to be used on its line any locomotive unless said locomotive, its boiler, tender, and all parts and appurtenances thereof are in proper condition and safe to operate in the service to which the same are put, that the same may be employed in the active service of such carrier without unnecessary peril to life or limb, and unless said locomotive, its boiler, tender, and all parts and appurtenances thereof have been inspected from time to time in accordance with the provisions of Sections 28, 29, 30, and 32 of this title and are able to withstand such test or tests as may be prescribed in the rules and regulations hereinafter provided for." In ruling plaintiff's above stated contention we must look to, and are bound by, the Act and the decisions of the Federal courts construing it.

Under that Act negligence need not be. proved for the Act itself "imposes upon the carrier an absolute and continuing duty to maintain the locomotive, and all parts and appurtenances thereof, in proper condition, and safe to operate in active service without unnecessary peril to life or limb." The duty placed upon the carrier by the Act makes the carrier an insurer as to matters included in the Act. Lilly v. Grand Trunk Western Railroad Company, 317 U. S. 481, 63 S. Ct. 347, 87 L. Ed. 407, 415, and cases there cited, Urie v. Thompson, 337 U. S. 163, 69 S. Ct. 1018, 1034, McCarty v. Pennsylvania Railroad Co., 156 Fed. (2d) 877, Ehalt v. McCarty, 104 Utah 110, 138 Pac. (2d) 639, Cantley'v. Missouri-Kansas-Texas R. Co., 353 Mo. 605, 183 S. W. (2d) 123, 126. The Act "is to be liberally construed in the light of its prime purpose, the protection of employees and others by requiring the use of safe equipment." Lilly v. Grand Trunk W. R. Co., supra. We have held that the Act "* * * does not limit the duty as to condition (of the engine, tender, 'and all parts and. appurtenances') to the time of starting (of a train). It prohibits the *use* of an engine (or tender) out of condition in interstate commerce, and *it can make no difference when that unfit condition arises.*" (Emphasis ours) Kilburn v. Chicago, M. & St. P. Railway Co., 289 Mo. 75, 232 S. W. 1017, 1023. See also, McCarthy v. Pennsylvania R. Co., supra. The federal courts have held that "It is a rule of wide acceptation that since railroad companies have no control over the vagaries of the weather or climatic conditions that there is no liability for injuries resulting from mere existence of ice or snow *and disconnected from other circumstances.*" (Emphasis ours) Raudenbush v. Baltimore & Ohio R. Co., 160 Fed (2d) 363, 366, McGivern v. Northern Pacific R. Co., 132 Fed. (2d) 213, 217, 218. See also, Tobin v. Detroit T. & I. R. Co., (Ohio) 13 N. E. (2d) 739, 744.

With the above stated principles in mind, and in the light of the facts presented by this record, what of defendant's above stated con-

tention? Assuming that normal operating conditions of a steam locomotive under the conditions which existed had a *tendency* to draw condensed steam and moisture between the cars and engine and form ice on the tender and ladder, yet, such tendency was not, under the evidence now before us, "disconnected from' other circumstances." The' other circumstances here of record establish affirmatively (1) a steam leak under the rear end of the tender, (2) that the ice or frost on the cross-pieces and side bars of the ladder, which made the ladder "slippery * * * *came from the steam that was leaking*" under the rear end of the tender, (3) that when plaintiff was descending the ladder, in the performance of his duties, the escaping steam blinded him and his "foot slipped off the ice on one of these rounds" (of the ladder) causing him to fall and sustain injury. The evidence now before us shows the source of the ice on the ladder to be the steam which was permitted to escape from the leak under the rear of the tender. Upon our consideration of the sufficiency of the evidence to support the verdict rendered, the theory of the defendant in this case that the moisture emitted from the locomotive had a *tendency* to be drawn in behind the tender and there freeze on the ladder cannot avail against the affirmative testimony set out above. In considering ▮▮▮ the motion for directed verdict we must accept the affirmative testimony that the ice on the ladder "came from the steam that was leaking."

Defendant's insistence that there was no steam leak when the train left Rawlings, and that the train did not stop until it reached Rock Springs, is neither determinative nor persuasive. Under the Act and the decisions construing it, a lack of notice to defendant that the equipment covered by the Act was not in "proper condition and safe to operate" is no defense. Fryer v. St. Louis-San Francisco Ry. Co., 333 Mo. 740, 63 S. W. (2d) 47, 51, Baltimore & Ohio R. Co. v. Groeger, 266 U. S. 521, 45 S. Ct. 169, 69 L. Ed. 419, Louisville and N. R. Co. v. Stephens, 298 Ky. 328, 182 S. W. (2d) 447, 453. The Act forbids *the use* of an unfit tender and "it can make no difference when that unfit condition arises." McCarthy v. Pennsylvania R. Co., supra. The duty of defendant to use only a tender "in proper condition and safe to operate in the service to which * * * (the tender is put) * * * without unnecessary peril" is absolute and continuous. Lilly v. Grand Trunk W. R. Co., supra. It here clearly appears that the steam leak under the tender was the cause of the ice on the ladder. The ice on the ladder was the cause of plaintiff's fall.

In its brief the defendant urges that "there was a total failure to prove that any unnecessary peril caused Banta's injuries." Defendant states, "plaintiff's case fails because of one inescapable fact: He failed to prove that any unnecessary peril caused his injuries." To that we cannot agree. It is also urged that "there wasn't one iota of

evidence to show that the hazard could have been avoided." Defendant overlooks or ignores the testimony of plaintiff we have hereinabove quoted that "the ice on the ladder, or frost * * * came from the steam that was leaking."

The words "unnecessary" and "peril" are words of every day usage and common understanding. As used in this Act we see no mystery in them. "Unnecessary", means that which is not required by the usual circumstances. "Peril", means an exposure to injury or destruction. "Unnecessary peril", as used in the Act, means an exposure to injury or destruction which is not required by the usual circumstances of the particular duty the employee is to perform, but which is an exposure to injury over and above that which is usually, ordinarily or necessarily incidental to the performance of the particular duty. Except for the instant violation of the Act, i. e., the leaky steam line, it does not appear here that the usual circumstances of plaintiff's duty to use the ladder would have compelled him to use an ice covered slippery ladder, but under these circumstances and under this evidence the escaping steam had caused the ladder to be covered with ice and to be slippery. In having to use this slippery ice covered ladder on this occasion plaintiff was exposed to an injury; and it does not here appear that such exposure would have existed had not the steam been permitted to escape from a tender which was not safe to operate in the service. It is crystal clear that under this evidence defendant's violation of the Act created an unnecessary peril to plaintiff in the performance of his duty. Under the circumstances here and under this evidence, if correctly instructed, the jury could properly have found that the escaping steam was a violation of the Act, and that the resulting ice on the ladder constituted an "unnecessary peril" within the meaning of the Act.

Defendant argues that Lilly v. Grand Trunk Western R. Co., supra, is not authoritative here. We rule that it is. That opinion of the United States Supreme Court extended the scope of the Act, and we are bound by it. In that case a fireman fell from the ice covered top of a tender while he was thereon to fill the tank with water from a spout at the side of the track. In a unanimous opinion the Court there held: "The *use* of a tender upon whose top an employee must go in the course of his duties, which is covered with ice seems to us to involve 'unnecessary peril to life or limb'—enough so as to permit the jury to find that the Boiler Inspection Act has been violated." In an effort to distinguish the ▮ Lilly case, defendant argues, however, that the Court's conclusion in the Lilly case was based on the fact that Rule 153 of the Interstate Commerce Commission (see 87 L. Ed. pp. 415, 416) required that the particular place where Lilly was when he fell be "kept clean". Defendant insists such fact appears from the discussion of the Lilly case by the Utah Supreme Court in Ehalt v. McCarthy, supra, and appears also in the Camp case noted in the

next paragraph herein. But we cannot agree that the force of the Lilly case has been modified in any respect by the Ehalt or Camp cases, or by any case we have found. The Lilly case and our Kilburn case ruled that the Act forbids the *use* of an appurtenance the *condition* of which constitutes an "unnecessary peril" to a trainman whose duty it is to use it. The Act itself (not the Interstate Commerce Commission rule) contains the prohibition against the *use* of a tender which is not "in proper condition and safe to operate", etc.

Defendant cites Camp v. Atlantic Coast Line Railroad Co., 251 Ala. 184, 36 Sou. (2d) 331, and urges that that case "is particularly persuasive". In that case the deceased switchman died as the result of a fall from a greasy locomotive footboard. The Alabama Supreme Court ruled that the grease on the footboard "occurred as the result of normal operations." That fact alone sufficiently distinguishes the Camp case. In the Camp case there was "no evidence of when or how it (grease) came to be there (on the footboard), if at all. * * * It is purely speculative as to when or how it got there." The icy condition of the ladder here is affirmatively shown by the evidence to have resulted from the steam leak under the tender. It was not the result of "normal operations." It was the result of the steam line being out of repair and defective and thus permitting steam to escape. The escape of that steam was *not* normal. From this evidence the jury could find that the defective steam line was a violation of the Act, and that that defective steam line made this tender unsafe to operate and was an unnecessary peril to plaintiff.

As to defendant's argument that "there wasn't one iota of evidence to show that the hazard could have been avoided" it is sufficient to state that there was no burden on plaintiff to *dis*prove anything. Under the Act plaintiff must prove, and he did prove, that defendant used a tender which was not "in proper condition and safe to operate * * * without unnecessary peril" and that as a result thereof he sustained injury. But in defendant's just above stated argument, and throughout defendant's brief, it has chosen not to consider plaintiff's testimony (on cross-examination) that "the ice on the ladder, or frost * * * came from the steam that was leaking". The evidence before us makes a case for the jury under the Act as construed by the Federal courts. We hold that the trial court correctly overruled defendant's motion for a directed verdict.

Defendant next contends that the trial court erred in giving plaintiff's requested instructions numbered 1A and 2. Instruction 1A was the only instruction which purported to cover plaintiff's entire case and predicate his verdict. As to the ice or frost on the ladder instruction 1A required only that the jury find "from the evidence that there was ice or frost on the ladder and sill of said tender at the time in question, and that such ice or frost, if any, involved unneces-

sary peril to plaintiff in the use of said ladder and sill in descending from the tender, and if you further find that as a direct result of such ice or frost, plaintiff was caused to slip and fall,'' etc.

Instruction 2 was as follows: ''If the jury find and believe from the evidence that there was ice or frost upon the ladder in question and that by reason thereof said ladder was slick and slippery, which involved unnecessary peril to the life or limb of plaintiff Banta, if you so believe and find from the evidence, then you are instructed that it is immaterial to the issues in this case as to how or through what causes said ice or frost, if any, came upon said ladder.''

We agree with defendant's contention that these instructions are broader in scope than the issues made by the pleadings. ██ Plaintiff's petition tendered the issue that defendant permitted a steam line, an appurtenance on its tender, ''to become defective and allow and permit steam to escape, obscure the vision of this plaintiff and to freeze on said ladder, causing it to become icy and slick * * * (and become) unsafe to operate in the service * * * and thereby involve unnecessary peril to plaintiff'', etc. Those allegations were denied in defendant's answer. Plaintiff's evidence tended to prove the above quoted allegations of his petition. After stating the effect of the Act, instruction 1A, however, required the jury to find only (1) the mere existence of ice or frost on the ladder, and (2) that such existence of ice or frost thereon involved unnecessary peril to plaintiff.

Therefore, instruction 1A, predicating a verdict for plaintiff, authorized such verdict even though the jury may have believed that the ice or frost on the ladder was the result alone of the tendency of the emitted engine moisture and steam to ''suck * * * between the cars and engine'' and thus form ice on the ladder solely from normal steam locomotive operation in winter. Thus instruction 1A did not include, and failed to submit as a required finding, one of the essential elements necessary to plaintiff's recovery. The essential element omitted from the instruction is that the ice on the ladder came from and was formed there by the steam which escaped from the leak under the tender. Thus instruction 1A fails to require a finding by the jury that defendant violated the Act. Our law requires that an instruction submitting plaintiff's case to the jury and predicating his recovery must include all the essential elements of plaintiff's case. Griffith v. Delico Meats Products Co., 347 Mo. 28, 145 S. W. (2d) 431, 435 (3), State ex rel. Long v. Ellison, 272 Mo. 571, 199 S. W. 984, 987 (4). And the failure to include an element essential to plaintiff's recovery in an instruction predicating plaintiff's verdict cannot be cured by any instruction given for defendant. State ex rel. Long v. Ellison, supra. It is also required under our law that the instructions be within (and no wider in scope than) both the pleadings and the evidence. Degonia v. St. Louis, I. M. & S. Ry. Co., 224 Mo. 564, 123 S. W. 807, 817, Mann v. Mann, (Mo. Sup.) 193 S. W. (2d) 492. Instruction 1A is

wider in scope than the issues tendered by the pleadings and is prejudicially erroneous.

Instruction 2 is likewise broader in scope than the issues in the case. The pleadings and the evidence show that plaintiff knew, alleged and proved that the ladder from which he fell was made icy by the congelation thereon of steam which escaped from a defective appurtenance under the tender. That was his theory of his case. But instruction 2 told the jury that under the law it was "immaterial to the issues in this case as to how or through what causes said ice or frost, if any, came upon said ladder". That was an affirmative misdirection as to the law and broadened the scope of the issues. If the jury had believed there was *not* any steam leak under the tender (and the evidence in the case overwhelmingly tended to prove there was not) and, if the jury had also believed that the ice on the ladder resulted solely from the tendency of emitted steam and moisture, in the normal winter operation of the train, to freeze on the rear of the tender and on the ladder (which the evidence in the case likewise overwhelmingly tended to prove), then the jury, under a correct instruction, would have returned a verdict for defendant. These instructions are peremptory in effect. As given they foreclosed any possibility of a verdict for defendant by declaring that it was "immaterial to the issues in this case as to how or through what causes said ice or frost * * * came upon the ladder."

Mere ice or frost or snow upon a ladder which resulted solely from the normal operation of a steam locomotive during existing winter climatic conditions, and disconnected from other circumstances, would not create liability, even under the Boiler Inspection Act. Ice or frost upon a ladder caused, as shown by plaintiff's own testimony here, by the congelation on the ladder of steam escaping from a defective appurtenance of the tender does create liability under the Act. There was evidence to support each such theory as to the possible cause of the ice on the ladder. ██ And under the evidence, the jury should have been properly instructed, and permitted to determine from the evidence in the case the cause and origin of the ice upon the ladder. For one of the two possible causes defendant was liable. For the other it was not liable. Clearly instruction 2 was wider in scope than the issues made by the pleadings and the proof, and it also gave the jury a roving commission to find for plaintiff upon *any* speculative basis "they could construct or evolve out of their own minds." Cervillo v. Manhattan Oil Company, 49 S. W. (2d) 183, Owens v. McCleary, 313 Mo. 213, 281 S. W. 682, 685. Instructions 1A and 2 were prejudicially erroneous and for their giving the judgment must be reversed and the cause remanded.

██ Defendant finally complains of the trial court's refusal to give its instruction D. This instruction sought to state in certain respects defendant's duty under the Act and undertook to submit

defendant's theory that the ice on the ladder "was formed thereon from moisture necessarily produced by the normal operation of the steam locomotive in freezing weather, or that it was formed by natural winter weather conditions." The instruction then continued and terminated by telling the jury that if they found "that said ladder and sill were not made any more slippery by a steam leak", then, the verdict should be for defendant.

There is no factual basis in the evidence for that above quoted last portion of the instruction which undertook to predicate a verdict for defendant upon a comparison of how slippery the ladder might be from ice of different sources. And, too, that was not the issue in the case at all, and could not possibly be used to predicate a verdict. The issue was whether the Act was violated and whether such violation, if any, proximately caused plaintiff's fall. The trial court did not err in refusing to give defendant's requested instruction D.

It follows that the judgment appealed from must be reversed and the cause remanded. It is so ordered. All concur.